### HOWLAND v. METROPOLITAN BANK.

(District Court, S. D. New York. May 12, 1915.)

1. CORPORATIONS ☞544—PREFERENTIAL TRANSFERS—STATUTORY PROVISIONS.

   Stock Corporation Law N. Y. (Consol. Laws, c. 59) § 66, provides that no corporation, which shall have refused to pay any of its notes or other obligations when due, shall transfer any of its property to any officer, director, or stockholder; that no conveyance or transfer of any property of any such corporation, nor any payment made by it when the corporation is insolvent, or its insolvency is imminent, with the intent of giving a preference to any particular creditor, shall be valid; and that every person receiving by means of any such prohibited act or deed any property of the corporation shall be bound to account therefor to its creditors or stockholders or other trustees. *Held* that, in determining whether the payment of a note before maturity was with intent to give a preference, the transfer must be viewed in the light of the situation as it existed at the time of the transaction, and the transaction could not be regarded as invalid because discredited by after events.

   [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2162–2169; Dec. Dig. ☞544.]

2. CORPORATIONS ☞544—PREFERENTIAL TRANSFERS—SUFFICIENCY OF EVIDENCE.

   In an action by the receiver of a corporation against a bank, evidence *held* to show that when the corporation, before maturity and shortly before the appointment of a receiver, took up a note, held by the bank and indorsed by individuals in control of the corporation, and gave a new

note for a smaller amount, paying the difference, there was no intent to give a preference.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2162–2169; Dec. Dig. ☞544.]

3. CORPORATIONS ☞543—PREFERENTIAL TRANSFERS—BONA FIDE TRANSFEREES.

Stock Corporation Law N. Y. § 66, prohibits preferential transfers by corporations while insolvent, or when insolvency is imminent, and provides that no such transfer shall be void in the hands of a purchaser for a valuable consideration without notice. A corporation before the maturity of a note indorsed by individuals in control of the corporation took up the note, paid part of the indebtedness, and gave a new note for the balance with the same indorsers. *Held,* that the holder of the note gave a valuable consideration for the part payment.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2161; Dec. Dig. ☞543.]

At Law. Action without a jury by Silas Howland, as receiver of the Improved Property Holding Company of New York, against the Metropolitan Bank. Judgment for defendant.

William M. Chadbourne and Minturn De S. Verdi, both of New York City, for plaintiff.

Woodford, Boyce & Butcher, of New York City (Frederick C. Tanner and James N. Luttrell, both of New York City, of counsel), for defendant.

MAYER, District Judge. Plaintiff, a receiver in an equity conservation suit, has brought this action to recover $50,000 because of an alleged preferential payment to defendant by the Improved Property Holding Company of New York (hereinafter called "Company"), the corporation of which plaintiff is receiver. To succeed the plaintiff must show that the payment came within the condemnation of section 66 of the New York Stock Corporation Law, which is as follows:

"Sec. 66. *Prohibited Transfers to Officers or Stockholders.*—No corporation which shall have refused to pay any of its notes or other obligations, when due, in lawful money of the United States, nor any of its officers or directors, shall transfer any of its property to any of its officers, directors or stockholders, directly or indirectly, for the payment of any debt, or upon any other consideration than the full value of the property paid in cash. No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid, except that laborers' wages for services shall be preferred claims and be entitled to payment before any other creditors out of the corporation assets in excess of valid prior liens or incumbrances. No corporation formed under or subject to the banking, insurance or railroad law shall make any assignment in contemplation of insolvency. Every person receiving by means of any such prohibited act or deed any property of the corporation shall be bound to account therefor to its creditors or stockholders or other trustees. No stockholder of any such corporation shall make any transfer or assignment of his stock therein to any person in contemplation of its insolvency. Every transfer or assignment or other act done in violation of the foregoing provisions of this section shall be void. No conveyance, assignment or transfer of any property of a cor-

poration formed under or subject to the banking law, exceeding in value one thousand dollars, shall be made by such corporation, or by any officer or director thereof, unless authorized by previous resolution of its board of directors, except promissory notes or other evidences of debt issued or received by the officers of the corporation in the transaction of its ordinary business, and except payments in specie or other current money or in bank bills made by such officers. No such conveyance, assignment or transfer shall be void in the hands of a purchaser for a valuable consideration without notice. Every director or officer of a corporation who shall violate or be concerned in violating any provisions of this section, shall be personally liable to the creditors and stockholders of the corporation of which he shall be director or an officer to the full extent of any loss they may respectively sustain by such violation."

[1] At the outset, it will be noted that plaintiff must show, among other things, that the Company or its officers intended to give a preference to defendant. In a case of this kind we must carry our minds back to the situation as it was at the time of the transaction under consideration. Such is the mental approach which enables courts to award redress for frauds, even though dealings seem innocent on their face, and, per contra, to refrain from stigmatizing as offensive to statutes, such as this, transactions honestly and fairly engaged in, merely because after events and a later point of view tend to discredit what, at the time, was beyond question.

[2] So far as the evidence in this case discloses, Henry Corn, Alwyn Ball, Jr., and Joseph J. O'Donohue were the active and controlling men in the affairs of the Company. The Company had been a borrower from the defendant, the business between the two being conducted for the Company by Corn and for the defendant by Ollesheimer, its president. On three occasions, viz., September 7, 1911, November 28, 1911, and February 14, 1912, the Company had paid its notes prior to maturity. As related to the payments on the two first-named dates, the loans were increased in the ordinary and orderly course of business. On February 14, 1912, the payment of a note for $12,500 due April 8, 1912, was anticipated, the Company then having in hand some $220,000 additional cash realized from what are referred to in the case as the Assets Realization Guardian and Empire Trust Companies' loans.

When, therefore, on May 13, 1912, the transaction complained of took place, Ollesheimer naturally had no reason to suppose that as between his bank and the Company a different situation existed than had theretofore obtained. On that day, two notes due June 4 and July 5, 1912, respectively, and aggregating $50,000, were paid. On these notes Corn, Ball, and O'Donohue were indorsers, as they had been on previous notes. The Company had $8,603.38 on deposit, and added thereto $23,000. The bank rebated $283.33 interest, and then discounted the Company's note for $25,000 due September 13, 1912, with the same three men as indorsers. The net result was that the Company and the indorsers reduced their liability to the bank from $50,000 to $25,000, and thus the $25,000 then paid off is the amount really in controversy.

It is conceded, and, in any event, the evidence is uncontradicted, that Ollesheimer had no knowledge whatever of the embarrassments

of the Company and not the slightest reason to suppose that the payment was preferential or intended so to be. What, then, was the intent of the Company? That, of course, must be determined from all the existing facts and surrounding circumstances, as well as from what, according to their testimony, was in the minds of Corn, Ball, and O'Donohue. That their testimony was truthful I do not doubt for a moment. And why not? There is not in this case a suggestion of unloading, as not infrequently appears when an enterprise is in difficulties. On the contrary, these men were straining every means to save what they believed was a plus from becoming a minus, as of necessity so often occurs when receiverships arrive on the scene.

The Company owned or operated leaseholds as follows, covered by the so-called A mortgage:

84–90 Fifth avenue,
110 Fifth avenue,
315 Fifth avenue,
320 Fifth avenue,
341–347 Fifth avenue,
894–900 Broadway,
1161–1175 Broadway,
43–47 West Thirty-Third street,
Forty-Second street and Sixth avenue.

Under the B mortgage, so called, were the following:

Brunswick Building,
2–4–6 East Thirty-Fourth street,
505 Fifth avenue—

and the following fees:

303 Fifth avenue,
395 Broadway.

Undoubtedly, at the time when these various properties were acquired and thereafter they certainly looked promising. Where is the man so wise who could have foreseen the calamities that have befallen real estate in various sections, and more especially in certain parts of Broadway and Fifth avenue? One need but walk north from the courthouse by any route to note the sad and mute witnesses to the fallibility of human judgment in investing in or dealing with realty in this ever-changing metropolis.

There is no need of an elaborate analysis of the figures argued from and about by these litigants. The Company was and had been hard up for cash, but it owned or controlled what its directors were justified in believing (even if their judgment was mistaken) were assets over liabilities. There came a time when it was desirable to obtain, if possible, a mortgage to cover the whole situation and retire mortgages A and B, and this it was hoped could be accomplished by placing in France the bonds of a mortgage called M. There is nothing strange about such an effort or its good faith. There is no reason to doubt O'Donohue's statement that he "had every reason to believe, by letters and cables that I saw, that they would absolutely go through with De Luze & Co of Paris." It was not until May 17, 1912, that hope was abandoned and an equity receivership was reluctantly resorted to.

When we consider the size of this Company's property, the fact that Corn, Ball, and O'Donohue could easily have relieved themselves of all liability to the defendant, instead of indorsing the $25,000 note due September 13, 1912, the comparatively trifling proportion which $25,000 bore to the whole situation, the earnest and emphatic statements under oath of these three men, the utter lack of knowledge of the defendant, and absence of any secret or collusive arrangement, it is flying in the face of experience to conclude that the Company had any intent to prefer.

I see no occasion for further discussion, although much more could be said; but, having seen the witnesses and carefully followed the figures, I find as a fact, upon all the evidence, that there was not any intent to prefer. This renders it unnecessary for me to consider the question of insolvency, as to which plaintiff relies largely on inability to pay current debts.

I may remark in passing, however, that notwithstanding the undoubtedly conscientious testimony of Stevens as to the value of the Fifth avenue and Thirty-First street property, I would rather, in a case of this kind, take the judgment of a rough diamond like Smith. There is a sense of smell, as it were, about values, which is more likely to be right than all the automatic rules of experts, and I have seen men in the auction room in Vesey street who could hardly write their names, who knew more about the right price at which to buy and sell than some of the students who had the historic price of the neighborhood per front foot at their finger's ends.

[3] Finally, the statute provides:

"No such conveyance, assignment or transfer shall be void in the hands of the purchaser for a valuable consideration without notice."

That defendant did not have notice is conceded, as stated supra. That there was a valuable consideration has been disposed of by Perry v. Van Norden Trust Co., 192 N. Y. 189, 84 N. E. 804; for the view of the highest court of New York must be followed. I see no distinction in principle between the Perry Case and the case at bar.

The argument of plaintiff is that, because the indorsers would be benefited, therefore the defendant bank could now recover. But in the light of the Perry Case how could the defendant bank recover against the indorsers, especially in the absence of fraud? If a judgment were to go against the defendant, about all that would be left to the defendant would be a lawsuit against the indorsers, with no reasonable prospect of recovery at the end. We would thus have the spectacle of a court penalizing a bank innocent of guilty knowledge or wrongdoing for a transaction consonant with the usual and orderly course of a banking business. I am of opinion that the Legislature of New York never intended that section 66 should be tortured to accomplish such a result.

Judgment for defendant.